MAX N. TOBIAS, JR., Judge.
LThe plaintiff, James H. Stone, Jr., appeals the trial court’s dismissal of his claim against defendants, Entergy Services, Inc. and Entergy Corporation, for retaliatory discharge at the conclusion of his presentation of his case-in-chief. For the following reasons, we affirm.
Relevant Facts and Procedural History In 1986, James H. Stone, Jr. (“Stone”) began working as an environmental analyst in the Environmental and R & D Services department of MSU System Services, Inc. (“System Services”).[1] The environmental side of this department was comprised of Stone and five other environmental analysts, all of whom provided various environmental services to the Middle South Utilities, Inc. (“Middle South”) operating companies. At all times the System Services’ Environmental and R & D Services department served at the whim of the operating 12companies, which were free to either contract with System Services or provide these services in-house through their own environmental staffs.
In 1989, Middle South changed its name to Entergy Corporation, and System Services became Entergy Services, Inc. (“En-tergy”). Following the name change, management began a series of organizational changes in the structure of the En-tergy system that ultimately led to Stone’s termination in February 1993. In 1990, management decided that each operating company would maintain its own environmental group, thus making the department that employed Stone at Entergy unnecessary. At the time his department dissolved, Stone was the only environmental analyst remaining within Entergy.[2] Despite there no longer being a true environmental group within Entergy, Stone was not discharged, but rather, was transferred to Entergy’s Performance and Design section. Stone continued to perform environmental services, although this was not a major function of his department.
In 1991, as a part of the reorganization efforts, the Performance and Design section was also terminated. Consequently, because Stone’s department no longer existed, he was placed in the environmental *196 incumbent/talent pool, along with all other persons who previously held environmental positions throughout the Entergy system. While in the talent pool, Stone continued to perform his prior job duties until management announced the new system-wide environmental organizational structure. In October 1991, Stone interviewed for a position in this newly created group within Entergy, but was not selected for a position and remained in the talent pool. In February 1992, Stone secured one of two newly created environmental ^positions in the Entergy Services Transmission department, where he remained for approximately one year.
In 1992, management again ordered a reorganization and consolidated the Enter-gy, Louisiana Power & Light (“LP & L”), New Orleans Public Service, Inc., Arkansas Power & Light, and Mississippi Power & Light (“MP & L”) Transmission, Customer Distribution, and Service organizations into a single system-wide strategic business unit known as “TDCS.” Chris Longinotti (“Longinotti”) was charged with consolidating the environmental groups servicing the old Transmission, Distribution, and Customer Service organizations into one group supporting the new TDCS organization. The consolidation resulted in the elimination of two environmental positions previously servicing the old TDCS organization.
In the fall of 1992, Longinotti was given a list of employees who were then employed in any environmental position in the Transmission, Distribution, and Customer Service organizations throughout the system, which included Stone, and met with their direct supervisors to discuss each individual’s performance. Longinotti then interviewed each of these employees for the available positions within his newly formed group.[3] Longinotti did not offer a position to Stone and, in or about December 1992, informed him that there were no other environmental positions available in the system. Stone was terminated from his position as environmental analyst on 11 January 1993, and, once again, placed in the talent pool. He was then terminated from Entergy on 10 February 1993.
|4Following his termination, Stone filed a claim with the Equal Employment Opportunity Commission (“EEOC”) asserting age and disability discrimination. While this claim was pending, on 25 January 1994, Stone filed the instant action in state court alleging retaliatory discharge in violation of La. R.S. 30:2027, the Louisiana Environmental Whistleblower Statute.[4]
A jury trial commenced on 23 October 2007. Following opening arguments, Stone called three witnesses to testify in support of his claims against Entergy. In addition to himself, Stone called Longinot-ti, the Entergy employee that bypassed employing Stone in favor of another in-house applicant for a position in his department, and an economist. Following *197 the testimony of these three witnesses, Stone rested his case.
 At the close of Stone’s case-in-chief, pursuant to La. C.C.P. art. 1810, Entergy orally moved for a directed verdict on the basis that Stone failed to establish a pvwiCL facie case of retaliatory discharge as is required by La. R.S. 30:2027. Following argument on the motion, the trial judge took the matter under advisement. Then, outside the presence of the jury, the trial judge granted an involuntary dismissal of Stone’s claim pursuant to La. C.C.P. art. 1672, assigning oral reasons.[5] Specifically, while the trial judge questioned the applicability of the [-¿Louisiana Environmental Whistleblower Statute on the basis that it was part and parcel of Stone’s job as an Entergy environmental analyst to report to his supervisor any concerns of environmental violations occurring on the jobs to which he was assigned, and noted that there was no outside agency to whom Stone reported these violations, the trial judge nevertheless determined that Stone failed to establish a causal connection between the environmental reports and his subsequent discharge from Entergy as is required by the statute. In short, the trial judge determined that the evidence adduced by Stone during his case-in-chief established nothing more than that his position as an environmental analyst was eliminated as a result of Entergy’s reorganization process due to the economy of scales.
Following the judge’s ruling on Enter-gy’s motion, the jury was released in order that Stone could seek appellate review. Stone filed an emergency writ [ 6application in this court seeking review of the trial judge’s grant of Entergy’s oral motion, which writ was denied. The instant appeal followed.

*198
Discussion

It is a well-established principle of Louisiana law that legal sufficiency of the evidence challenges, such as presented by a motion for directed verdict, are subject to the de novo standard of review that is used for all legal issues. See Hall v. Folger Coffee Co., 03-1734, p. 10 (La.4/14/04), 874 So.2d 90, 98. A party may move for directed verdict at the close of evidence offered by an opponent. La. C.C.P. art. 1810.
As stated in Price v. Law Finn of Alex O Lewis, III and Associates, 04-0806, (La.App. 4 Cir. 3/2/05), 898 So.2d 608:
A directed verdict is properly granted when, considering all of the evidence in the light most favorable to the non-mover, it is clear that the facts and inferences point so strongly and overwhelmingly in favor of the mover that reasonable jurors could not reach a contrary verdict. Davis v. Board of Sup’rs Louisiana State University and Agricultural and Mechanical College, 03-2319, p. 7 (La.App. 4 Cir. 11/17/04), 887 So.2d 722.... If substantial evidence opposed to the motion exists, i.e., evidence of such quality and weight that reasonable jurors in the exercise of impartial judgment might reach a different conclusion, the motion should bé denied and the case submitted to the jury.
A trial judge has much discretion in determining whether to grant a directed verdict and the standard of review on appeal is whether reasonable persons could not reach a contrary verdict under the evidence. The question to be asked by the reviewing court is not whether the plaintiff proved his case by a preponderance of the evidence, but rather, upon reviewing the evidence submitted, the court could conclude that reasonable persons could not have reached a verdict in favor of plaintiffs. Id. (citing, Hebert v. BellSouth Telecommunications, Inc., 01-00223, p. 5 (La.App. 3 Cir. 6/6/01), 787 So.2d 614, 617). Further, the appellate court must determine if the record supports the granting of a directed verdict, based not on a credibility 17determination (a factual issue), but on a sufficiency of evidence determination (a question of law). Id.; Roberson v. August, 01-1055, pp. 4-5 (La.App. 4 Cir. 5/29/02), 820 So.2d 620, 624.
A directed verdict must be evaluated in the light of the substantive law underpinning the plaintiffs claim.
Price, 04-0806 at pp. 2-3, 898 So.2d at 610.
Pursuant to La. R.S. 30:2027, Louisiana’s environmental whistleblower statute, retaliation against employees who report or disclose environmental violations under certain conditions is prohibited. In order for a plaintiff to establish a prima facie case of retaliation under the statute, he must show: (1) that he engaged in activity protected by the statute; (2) he suffered an adverse employment action; and (3) a causal connection existed between the protected activity in which he engaged and the adverse action. See Guillot v. Walgreen Louisiana, Inc., 2008 WL 1744717, *3 (W.D.La. April 16, 2008); Imbornone v. Treasure Chest Casino, 2006 WL 1235979, *3 (E.D.La. May 3, 2006). The trial court, in its oral reasons, conclud ed that Stone failed to produce the necessary factual support for one of the essential elements required to establish a claim under the statute; i.e., a causal connection between Stone’s reports of environmental violations and his subsequent termination from Entergy.[6] We, however, pretermit discussion regarding whether Stone estab *199 lished the requisite causal connection as we conclude that, based upon our de novo review of the record, Stone failed to produce sufficient evidence to establish the statute’s threshold requirement: the | ^environmental violations he allegedly reported constituted “protected activity” as contemplated by the statute. Accordingly, we affirm the trial court’s grant of Enter-gy’s motion to dismiss at the close of the evidence of Stone’s case-in-chief.
La. R.S. 30:2027 provides, in pertinent part:
A. No firm, business, private or public corporation, partnership, individual employer, or federal, state, or local governmental agency shall act in a retaliatory manner against an employee, acting in good faith, who does any of the following:
(1) Discloses, or threatens to disclose, to a supervisor or to a public body an activity, policy, practice of the employer, or another employer with whom there is a business relationship, that the employee reasonably believes is in violation of an environmental law, rule, or regulation.[7]
The purpose of the Louisiana Environmental Whistleblower Statute is to protect employees from retaliatory action or other adverse employment action by employers for reporting possible environmental violations under certain circumstances. Bear v. Pellerin Construction, Inc., 01-0984, p. 5 (La.App. 4 Cir. 1/30/02), 806 So.2d 984, 989. Stone suggests that the mere fact that he made reports of environmental violations were sufficient to constitute “protected activity” invoking protection of the whistleblower statute. We disagree.
According to his trial testimony, Stone reported five separate environmental violations during his tenure with Entergy, which he contends include the following:
1. In or about 1990-1991, Stone reported a potential environmental violation involving one of its customers, MP & L, arising out of a partial tank collapse occurring in Mississippi. Stone prepared a memo regarding the violation and sent it directly to MP & L, a subsidiary of liiEntergy Corporation, warning of potential civil and criminal penalties. Stone’s Entergy supervisor at the time, Gary Barnes, later learned of the memo and allegedly reprimanded Stone for preparing it and for sending it directly to MP & L.
2. Stone reported an environmental violation directly to LP & L engineers working at the Entergy Bayou Ver-ret substation at the foot of the Sunshine Bridge regarding the failure to cover trucks carrying sand or soil on public streets. Stone’s supervisor, Ronnie Beam (“Beam”), later learned of Stone’s complaint pursuant to a call directly from LP & L, prompting Beam to counsel Stone.
3. Stone reported the existence of an uninterruptible power supply containing PCBs in a structure that also housed a food-preparation area located at an emergency operations facility in violation of federal regulations directly to an LP & L engineer located at the facility.
*200 4. Stone contends that his signing a “QAT” report regarding Entergy’s secondary containment plan for-large oil storage tanks with reservations, because he believed that the transformers at substations located throughout the Entergy system were in violation of environmental regulations, constitutes “complaining” under La. R.S. 30:2027(A)(1), or refusing to participate in work he believed was in violation of federal environmental regulations regarding oil storage containment/runoff.[8]'
5. Stone was told by his supervisor, Beam, to procure a renewal of a permit for the disposal of wood waste located in an area known as the Gypsy Corridor. When he went to inspect the area, Stone observed trash, utility poles and debris, which he opined was an environmental violation. Stone reported his findings to Beam, who advised him not to worry about the situation and that he would “take care of’ the problem.[9]
Considering these five reports, the first three listed above were not made directly to a supervisor or a public body as required to invoke protection under the whistleblower statute. Instead, they were made directly to Entergy’s customers — the Entergy operating companies themselves (e.g., LP & L and MP & L)- — and were only later brought to the attention of Stone’s supervisor. As to the remaining two 110alleged reports of environmental violations, there is no trial testimony to support Stone’s contention that he was reprimanded or counseled for those incidents. Accordingly, based on Stone’s trial testimony, we find that the environmental reports he allegedly made do not constitute “protected activity,” which would trigger protection under La. R.S. 80:2027.
Additionally, according to Stone’s own trial testimony, as well as the testimony of Longinotti, it was part of Stone’s job responsibilities, as an environmental analyst for Entergy, to report potential environmental violations or concerns to his supervisor. While we find no Louisiana case directly on point, we further hold that the Louisiana Environmental Whistleblower Statute does not afford protection to an employee who generates reports regarding environmental issues when reporting environmental issues, concerns, and potential violations is a part of one’s normal job responsibilities, and part and parcel of what one is hired and/or required to do. Accordingly, because we find that reasonable jurors could not conclude from the trial testimony that the whistleblower statute applies to the retaliatory discharge claims asserted by Stone, the trial court, as a matter of law, properly granted En-tergy’s motion for directed verdict.

Conclusion

For the foregoing reasons, we affirm the trial court’s judgment dismissing Stone’s claims.

AFFIRMED.

ARMSTRONG, C.J., concurs.

. System Services was the predecessor company of Entergy Services, Inc. ("Entergy”). It was a wholly owned subsidiary of Middle South Utilities, Inc., and it provided a variety of services on a contract basis to the various operating companies that comprised the Middle South Utilities Inc. system. These operating companies included Louisiana Power & Light, New Orleans Public Service, Inc., Arkansas Power & Light, Mississippi Power & Light, and System Energy Resources, Inc.
Prior to joining Entergy Services, Inc. in 1986, Stone worked as an environmental regulator for the Louisiana Department of Environmental Quality ("DEQ") and the federal Environmental Protection Agency ("EPA”).

. Everyone else had either retired, resigned, or transferred into another department.

. According to the trial testimony, Longinotti had three positions to fill on his team and five employees, including Stone, were vying for the three slots.

. Upon receipt of a right-to-sue letter form the EEOC, Stone filed an action in the United States District Court for the Eastern District of Louisiana alleging discrimination on the basis of age and qualified disability. Stone later amended his federal complaint to add the identical state law environmental whistle-blower claim asserted in the instant litigation. The district court dismissed the age and disability discrimination claims on Entergy’s motion for summary judgment. Stone’s state law environmental whistleblower claim was dismissed without prejudice. Entergy later moved for summary judgment in the instant action on grounds of res judicata (collateral estoppel), which the trial court granted. This court reversed and the Supreme Court denied Entergy’s application for supervisory writs.

. Stone argues on appeal that the trial judge erred in granting an involuntary dismissal in this case. We agree that the motion for involuntary dismissal was not the proper procedural vehicle because this matter was not tried by a judge, but by a jury. La. C.C.P. art. 1672, pertaining to motions for involuntary dismissal, provides, in pertinent part:
B. In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence. [Emphasis supplied.]
In a jury trial, an involuntary dismissal is only allowed when either the plaintiff, or when both parties fail to appear on the day set for trial. Hoffman v. Paracelsus Elmwood Medical Center, Inc., 03-0659 (La.App. 4 Cir. 9/1/04), 881 So.2d 796, 805. Therefore, procedurally, in the instant case, an involuntary dismissal was not available at this stage of a jury trial. The proper procedural mechanism would have been for the trial court to have granted a “directed verdict” pursuant to La. C.C.P. art. 1810, discussed infra.
Thus, while Stone is correct that the trial judge erred in granting an "involuntary dismissal” of his case against Entergy, because an involuntary dismissal is not available in a jury trial, we find that the practical difference between an involuntary dismissal and a directed verdict is a distinction without a difference bearing the same effect; i.e., dismissal of the case. Judges, lawyers, and ordinary people confuse the terminology regularly when speaking and writing. The motion for either is understood to mean that a party has not carried his/her/its burden of proof as a matter of law. Thus, even though the trial court erred in granting an involuntary dismissal rather than a directed verdict, the trial court’s misspoken terminology was purely harmless, for it is clear that the trial court meant that Stone had failed to carry his burden of establishing a prima facie case of retaliation as matter of law.

. The trial court, however, in its oral reasons, did question whether Stone had engaged in “protected activity” as contemplated by the statute since the evidence adduced at trial *199 through the testimony of Stone and Longinot-ti established that it was incumbent upon Stone, as an environmental analyst for Enter-gy, to identify and report any concerns of possible environmental violations to his supervisors at Entergy. The trial court further questioned whether Stone’s reports constituted “protected activity” since they were only made internally to Entergy rather than to an outside agency such as the DEQ or the EPA, both of which previously employed Stone.

. This is the version of the statute that was in effect on 10 February 1993, the date Stone was terminated from Entergy.

. There is no trial testimony indicating that Stone ever actually brought the purported violations to Entergy’s attention, or that his supervisor, Beam, counseled or reprimanded him when he signed the report with reservations.

. Stone's testimony is devoid of any "repri- ■ mand” that he allegedly received from Beam regarding his reporting of his environmental concerns involving the Gypsy Corridor permit.